Filed 5/28/15  P. v. Moreno CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LOPEZ MORENO,<br><br>    Defendant and Appellant. | B247367<br><br>(Los Angeles County<br>Super. Ct. No. BA390713)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered the opinion filed herein on April 28, 2015, is modified as follows:

1.  On page 2, line 5 of the first full paragraph, the phrase "and in association with" is modified to read, "or in association with."

2.  In the last sentence commencing at the bottom of page 22 with "In the present case" and ending on page 23 with "a criminal street gang," the phrase "and in association with" is modified to read, "or in association with."

There is no change in the judgment.

On May 12, 2015, appellant filed a petition for rehearing.  The court has read and considered the petition.  The petition for rehearing is denied.

Filed 4/28/15 (unmodified version)
Opinion following rehearing

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID LOPEZ MORENO,<br><br>    Defendant and Appellant. | B247367<br><br>(Los Angeles County<br>Super. Ct. No. BA390713) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Laura S Kelly, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Linda C. Johnson, Theresa A. Patterson and David Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant David Lopez Moreno appeals from the judgment entered following his conviction by jury of second degree murder, with findings he personally used a firearm, personally and intentionally discharged a firearm, personally and intentionally discharged a firearm causing great bodily injury and death, and committed the offense for the benefit of, at the direction of, and in association with, a criminal street gang (Pen. Code, §§ 186.22, subd. (b)(1), 187, 12022.53, subds. (b), (c), & (d)).  The court sentenced appellant to prison for 40 years to life.  We affirm.

## FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established on August 10, 2009, Jesus Medina and her friend, Maria Flores, were in the parking lot of their apartment building on 81st in Los Angeles when Medina saw a man later identified as Cesar Garcia (the decedent). Garcia was riding a bicycle on 81st, away from Figueroa and towards Hoover.  Medina heard a gunshot, then saw Garcia fall.  Medina also testified she heard at least two gunshots.  A second man walked away from Garcia at a normal pace and, as the second man walked to an alley near Figueroa, he put an object in his waistband.  Medina believed the object was a gun.  Medina called 911, then approached Garcia.  No one else approached Garcia and there were no weapons around him.

Flores testified the incident occurred about 4:00 p.m. and she heard three gunshots.  According to Flores, after the shooting, the second male moved his right hand and walked away towards Figueroa.  Once the second male reached the alley, he ran. Rafael Anguiano, who lived on 81st street at the time of the shooting, testified that prior to the shooting he was on his front porch.  He too heard three gunshots, saw Garcia fall, and saw the second man tuck his right hand into his waistband as he walked away towards Figueroa.  Medina, Flores, and Anguiano each testified to the effect no one was near Garcia and the second man when the shooting occurred.

2

Miguel Rodriguez testified that on August 10, 2009, he lived in an apartment on 81st between Hoover and Figueroa. Sometime prior to 5:48 p.m., Rodriguez saw his neighbor "Lazy," later identified as Jerome Saucedo. Saucedo (a member of the Notorious 13 gang of Bell Gardens) was outside the apartment building and socializing with three men, two of whom were Notorious 13 gang (hereafter, Notorious) members. The third man was appellant. About 5:48 p.m., Rodriguez was in his apartment when he heard about three gunshots. Rodriguez exited and saw Saucedo running from the front of the apartment building towards the back. Shortly thereafter, appellant was coming alone from an alley and towards the back of the building, jumping fences. Saucedo asked Rodriguez to let Saucedo's "homey" hide in Rodriguez's residence, but Rodriguez refused. Rodriguez assumed appellant entered the building's laundry room.

Los Angeles Police Officer Bryan Schilling testified that about 5:55 p.m. on August 10, 2009, Schilling and his partner were the first responders to the shooting scene and about two blocks from it when they received the call to go there. Schilling arrived and saw Garcia bleeding from a gunshot wound to his head. The bicycle was between Garcia's legs and no weapons were near him.

Los Angeles Police Detective Bertha Durazo, the primary investigator in this case, testified that about 6:15 p.m., she arrived at the scene and saw Garcia's body. The shooting occurred in an area claimed by the 18th Street gang and another gang. No shell casings were at the scene, a fact consistent with use of a revolver during the shooting. Garcia had been an associate of the 18th Street gang.

On September 26, 2011, Durazo interviewed Saucedo about the shooting. He initially said he was inside his residence, heard gunshots, and went outside. He told Durazo he then saw an unknown male run towards a dead body, grab something, and flee. Durazo testified Saucedo later changed his story.

Durazo testified Saucedo later said, inter alia, the following. Saucedo was in the carport of his apartment building when the shooting occurred. Saucedo's friend (whom Saucedo later identified to Durazo as appellant (aka Sleepy)) was involved in the shooting. After appellant left Saucedo's yard, Garcia "banged on" appellant. Appellant

3

later "banged on him back." Appellant and Garcia were between cars, and appellant ducked. Appellant reappeared and Garcia, on a bicycle, had a gun.[1] Saucedo saw appellant shoot, then flee eastbound on 81st towards Figueroa.

Appellant returned to Saucedo's apartment through the alley, jumping fences to enter the apartment complex. Appellant asked Saucedo to hide him, but Saucedo refused. Appellant hid in the building's laundry room and at some point changed clothes. Appellant asked Saucedo to get the handgun appellant had left behind apartments near Figueroa.

On September 27, 2011, Durazo interviewed Xene Fernandez, Saucedo's sister. Durazo testified Fernandez said the following. On the day of the shooting, Saucedo's friend David (aka Sleepy) came over to Saucedo's residence. Saucedo and Sleepy later went outside. Fernandez was inside when the shooting occurred. After the shooting, Fernandez saw Sleepy jump a fence and approach the rear of the apartment building from an alley. Fernandez also saw Sleepy change his shirt around the time police spoke with him. Fernandez heard Sleepy tell police that Sleepy had been inside sleeping when the shooting occurred, but Sleepy's statement was a lie. Saucedo told Fernandez that Sleepy committed the shooting.

An autopsy revealed Garcia died from a single gunshot wound to his right temple. The bullet traveled from right to left and "slightly front" to back. Stippling near the wound indicated the gun, when fired, was most likely four to twelve inches from Garcia.

Bell Gardens Police Officer Angel Puente, a gang expert, testified he had been a police officer over 11 years, and had worked in the department's gang unit from 2004 through 2010. Notorious was an active gang in Bell Gardens during that six-year period. In 2009, the gang had 25 to 30 active members. Some of the gang's primary activities were murder, attempted murder, assault with a deadly weapon, robberies, and vandalism.

---

[1] Durazo denied any evidence obtained during her investigation supported Saucedo's assertion Garcia had a gun.

4

When Puente referred to primary activities, he was referring to crimes Notorious members were "consistently being arrested [for] and convicted of." He testified these were crimes of which he was aware based on his personal experience. The following then occurred: "[By The Prosecutor]: Have you consulted resources like databases, looked at other officers to confirm those numbers? [¶] [Puente:] Yes. One, personal knowledge through my investigations involving [Notorious], and I had a records clerk pull up several reports related to [Notorious]."[2]

Puente personally had arrested two Notorious members for murder. He also personally had investigated three to five cases involving the gang. One of those cases involved assault with a deadly weapon; another involved robbery and murder. Puente was aware of two murder convictions involving Notorious members. There were other murders not yet in court because there was not enough evidence. Based on four "subjects" from Notorious, which Puente testified was "obviously a small sample," he counted five robberies within the last 10 years, two of which robberies occurred in the last five years. Notorious and the 18th Street gangs were rivals. Based on a 2005 shooting, Notorious member Omar Ramirez was convicted of attempted murder. Based on a 2006 shooting, Notorious member Mike Oquendo was convicted of murder.

Puente testified "banging" was street vernacular referring to one person confronting another to determine what gang the latter was from. If a gang member "banged on" a rival gang member and the latter "banged back," a violent confrontation could be expected. Puente was familiar with appellant and Saucedo. Appellant was a

---

[2] During cross-examination, Puente testified his opinion that murder, attempted murder, robberies, and vandalism were primary activities of Notorious was based on "my experience, 11 years as a police officer in Bell Gardens, statements from other officers, research that I've done and had records clerks look up police reports involving [Notorious]." Puente also testified that, at the preliminary hearing, he testified "there just has to be more than one criminal case against a gang member before you consider the crime a primary activity of a particular gang." Puente added, "if you have a group of incidents, then you're picking the most common ones, the primary." During redirect examination, the prosecutor asked if a primary activity was a principal or chief occupation of a gang member, and Puente replied yes.

member of Notorious and his moniker was Sleepy. Saucedo was known as Lazy from Notorious.

In response to a hypothetical question based on evidence, Puente opined the shooting benefited the shooter's gang and the shooter. When the victim "bang[ed] on" the shooter and the shooter "bang[ed] back," this showed the shooting was committed in association with the gang because such conduct was typical of gang members, and they usually responded with violence. In defense, a psychologist testified concerning various factors affecting alleged eyewitness identifications.

## *ISSUES*

Appellant claims (1) the trial court erred by failing to give sua sponte CALJIC No. 8.50, (2) the jury instructions allowed the jury to convict appellant of murder without considering whether imperfect self-defense required a voluntary manslaughter conviction, (3) the prosecutor committed misconduct during jury argument, (4) cumulative prejudicial error occurred, and (5) insufficient evidence supported the true finding as to the gang enhancement allegation.

## *DISCUSSION*

1. *The Trial Court Did Not Prejudicially Err by Failing to Give CALJIC No. 8.50.*

Appellant claims the trial court prejudicially erred by failing to give sua sponte CALJIC No. 8.50, which distinguishes murder and manslaughter. The instruction, inter alia, indicates the People must prove beyond a reasonable doubt the absence of imperfect self-defense. CALJIC No. 8.50 states, inter alia, "To establish that a killing is murder . . . and not manslaughter, *the burden is on the People to prove beyond a reasonable doubt* each of the elements of murder and *that the act which caused the death was not done . . . in the actual, even though unreasonable, belief in the necessity to defend against imminent peril to life or great bodily injury*." (Italics added.)

In essence, appellant argues that because the trial court did not give CALJIC No. 8.50 with its above italicized language, the jury was never told (1) to prove the killing was murder, the People had to prove beyond a reasonable doubt appellant did not act in imperfect self-defense and (2) even if a defendant has intent to kill, imperfect self-

6

defense negates malice, precluding guilt for murder.  For the reasons below, we reject appellant's claim of prejudicial error.

a. *Pertinent Law.*

In *People v. Rios* (2000) 23 Cal.4th 450 (*Rios*), our Supreme Court stated, "The distinguishing feature [between murder and the lesser-included offense of manslaughter] is that murder includes, but manslaughter lacks, the element of malice. . . .  [¶]  Malice exists, if at all, only when an unlawful homicide was committed with the 'intention unlawfully to take away the life of a fellow creature' [citation], or with awareness of the danger and a conscious disregard for life [citations].  In certain circumstances, however, a finding of malice may be precluded, and the offense limited to manslaughter, even when an unlawful homicide *was* committed with intent to kill.  In such a case, the homicide, though not murder, can be no less than voluntary manslaughter." (*Id.* at p. 460, fn. omitted.)

*Rios* stated murder is the unlawful killing of a human being with malice, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter.  (*Rios*, *supra,* 23 Cal.4th at p. 460.)  *Rios* observed, " 'Generally, the intent to unlawfully kill constitutes malice,' " (*ibid.*) except a defendant who intentionally and unlawfully kills nonetheless lacks malice when the defendant acts in imperfect self-defense, i.e., with an unreasonable but good faith belief in the need to act in self-defense.  (*Id.* at pp. 453, 460.)  *Rios* stated these mitigating "circumstances" (*id.* at p. 461) reduce an intentional, unlawful killing from murder to voluntary manslaughter " 'by negating the element of malice' " (*ibid.*, italics omitted, quoting *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*)) otherwise inherent in such a homicide.

In a murder case, unless the People's evidence suggests the defendant killed in imperfect self-defense, the defendant is obligated to proffer evidence on this issue sufficient to raise a reasonable doubt of the defendant's guilt for murder.  (*Rios*, *supra,* 23 Cal.4th at pp. 461-462.)  *Rios* stated, "If the issue of . . . imperfect self-defense is thus 'properly presented' in a murder case (*Mullaney v. Wilbur* (1975) 421 U.S. 684, 704

7

[95 S.Ct. 1881, 1892] [*Mullaney*]), the *People* must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice. [Citations.] . . . In such cases, if the fact finder determines the killing was intentional and unlawful, but is not persuaded beyond reasonable doubt that [imperfect self-defense] was absent, it should acquit the defendant of murder and convict him of voluntary manslaughter. [Citations.]" (*Rios*, at p. 462.) This follows because evidence of imperfect self-defense sufficient to raise a reasonable doubt of the defendant's guilt for murder already has been presented to the trier of fact, and the People have not proven beyond a reasonable doubt imperfect self-defense was absent.

Appellate review of the adequacy of instructions is based on whether the trial court fully and fairly instructed on the applicable law. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) In determining whether error has been committed in giving or not giving jury instructions, an appellate court *must consider the instructions as a whole and assume jurors are intelligent persons capable of understanding and correlating all given instructions.* (*Ibid.*) The ultimate question is whether there is a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 (*Hajek and Vo*).) Moreover, any theoretical possibility of jury confusion concerning instructions may be diminished by the parties' closing arguments. (*Ibid*.)

As mentioned, appellant argues, inter alia, the trial court had a sua sponte duty to instruct, using CALJIC No. 8.50, that to prove the killing was murder, the People had to prove beyond a reasonable doubt appellant did not act in *imperfect* self-defense. Appellant cites no case holding that, nor have we found any such case.

Our independent research has revealed cases addressing an analogous claim, i.e., a claim of prejudicial instructional error regarding the People's burden of proof beyond a reasonable doubt (hereafter, People's burden) in relation to *perfect* self-defense.

8

In *People v. Sanchez* (1947) 30 Cal.2d 560 (*Sanchez*), the trial court refused the following defense-requested instruction relating reasonable doubt to perfect self-defense: " 'In a trial for murder it is not necessary for the defendant to establish self defense by evidence sufficient to satisfy the jury that the self defense was true, but if the evidence is sufficient to raise a reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal.' " (*Id.* at p. 571.) Such an instruction combines, in a single instruction, principles of reasonable doubt and justification (self-defense).

Notwithstanding the trial court's refusal, *Sanchez* later stated, " '. . . its principle was repeatedly brought to the attention of the jury for, . . . they were told as to murder of the first degree, again as to murder of the second degree, and again as to manslaughter, that to warrant a verdict of guilty they must believe 'beyond a reasonable doubt and to a moral certainty' that, among other things, the killing 'was not justifiable [or was unjustifiable] under the law as I have given it to you in the preceding instructions.' *They were also told that they 'should consider all of the instructions as a whole in arriving at' their verdict.* Under the circumstances the error in failing to give the instruction as requested was not prejudicial." (*Sanchez, supra,* 30 Cal.2d at pp. 571-572, italics added.)

In *People v. Sandoval* (1970) 9 Cal.App.3d 885 (*Sandoval*), the trial court gave the "standard instruction on reasonable doubt." (*Id.* at p. 887.) The trial court also gave defense-requested instructions on self-defense. (*Ibid.*) The defendant did not ask that the trial court give, and the trial court did not give, a *Sanchez* instruction (*Sandoval*, at p. 887), i.e., an instruction which *Sandoval* characterized as instructing that the jury "should acquit defendant if the evidence raised a reasonable doubt as to whether defendant was justified in killing [the victim] in self-defense." (*Ibid.*)

*Sandoval* concluded, "Here the judge fulfilled his *sua sponte* obligations when he instructed the jury on the general principles of reasonable doubt and self-defense." (*Id.* at p. 888.) *Sandoval* observed, "A trial court must instruct the jury *sua sponte* on 'those principles of law commonly or closely and openly connected with the facts of the case . . . ,' *but need not instruct on specific points developed at the trial unless requested*. [Citations.] . . . The *Sanchez* instruction is a specific point, actually a *pinpointing* or

9

amplification of two general principles -- the rule of reasonable doubt and the defense of justification." (*Sandoval*, at p. 888, second and third italics added.) *Sandoval* also stated, "Defendant's failure to request the amplifying *Sanchez* instruction bars his claim of error on appeal. [Citation.]" (*Ibid.*)

*People v. Adrian* (1982) 135 Cal.App.3d 335 (*Adrian*) involved a trial court's refusal to give a *Sanchez* instruction in an assault with a deadly weapon case. (*Id.* at p. 336.) *Adrian* held such an instruction must be given "upon request whenever the claim of self-defense has been properly tendered and the evidence warrants submitting the issue to the jury." (*Ibid.*) *Adrian* treated the instruction as a pinpoint instruction. (*Id.* at pp. 337-341.) (*Adrian* observed, "As to homicide cases, the function performed by the *Sanchez* instruction is now fulfilled by CALJIC No. 5.15.")[3] (*Id.* at p. 342, fn. 7.) *Adrian* concluded the trial court's erroneous refusal to give the instruction was harmless *in light of the fact the court gave CALJIC No. 2.90, CALJIC No. 2.01, and, on perfect self-defense, CALJIC No. 5.30.* (*Id.* at pp. 341-342.)

Similarly, in *People v. Wittig* (1984) 158 Cal.App.3d 124 (*Wittig*), the defendants were convicted of, inter alia, assault with a deadly weapon (*id.* at p. 126) and the People (in light of *Adrian*) conceded the trial court erroneously refused instructions that the defendants "were entitled to an acquittal if the evidence of self-defense was sufficient to raise a reasonable doubt." (*Wittig*, at p. 135.) However, *Wittig* concluded the error was harmless *because the trial court gave CALJIC Nos. 2.90 and 2.01, and instructions on perfect self-defense.* (*Id.* at pp. 135-136.)

---

[3]     The trial court in the present case gave CALJIC No. 5.15 (as to perfect self-defense). That instruction stated, "Upon a trial of a charge of murder, a killing is lawful if it was justifiable. The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is, not justifiable. If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty."

In sum, as to perfect self-defense, *Sandoval* concluded a trial court fulfilled its *sua sponte* duty by giving *separate* instructions, i.e., (1) a standard instruction on reasonable doubt, and (2) perfect self-defense instructions. Having done that, the trial court was under *no* sua sponte duty to give a *single* instruction *combining* the concepts of reasonable doubt and perfect self-defense. *Sanchez, Adrian*, and *Wittig* concluded a trial court erroneously *refused* to give a *defense-requested* combining instruction relating reasonable doubt to perfect self-defense.

Moreover, *Sanchez, Adrian*, and *Wittig* reviewed for prejudice a trial court's erroneous refusal to give a combining instruction relating reasonable doubt to perfect self-defense. *Adrian* and *Wittig* concluded no prejudice occurred because the trial court instructed with CALJIC Nos. 2.90 and 2.01, and with perfect self-defense instructions.

*Mullaney* involved jury instructions based on a state law requiring "*a defendant* charged with murder to prove that he acted 'in the heat of passion on sudden provocation' in order to reduce the homicide to manslaughter." (*Mullaney*, *supra,* 421 U.S.at p. 684-685, italics added.) *Mullaney* concluded the law violated due process, in part because it shifted the burden of proof to the defendant. (*Id.* at p. 701.) *Mullaney* later stated, "[w]e . . . *hold* that the Due Process Clause requires the *prosecution* to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." (*Id.* at p. 704, italics added.)

Leaving aside the fact *Mullaney* did not involve imperfect self-defense, we note *Mullaney's holding* pertained to error in the *allocation* of the burden of proof—to the *defendant* instead of to the People—in relation to heat of passion. *Mullaney* did not hold a trial court's otherwise correct allocation of the burden of proof to the People was erroneous merely because that allocation was *articulated* (1) in *separate* instructions on the People's burden, heat of passion, and the jury's duty to consider instructions as a whole, respectively, instead of (2) in a *single* instruction *combining* concepts of the People's burden and heat of passion. *Mullaney's* holding does not control the present case.

11

Moreover, *Adrian* and *Wittig*, which evaluated a trial court's refusal to give a defense-requested *Sanchez* instruction for prejudice, were decided after *Mullaney*. *Adrian* approvingly cited *Sandoval* for the proposition a *Sanchez* instruction is a pinpoint instruction. (*Adrian, supra,* 135 Cal.App.3d at p. 339.)

Nonetheless, after the present case was fully briefed, the Fourth District decided *People v. Speight* (2014) 227 Cal.App.4th 1229 (*Speight*). *Speight*, a case involving the interaction between attempted murder and attempted voluntary manslaughter, concluded a trial court erred by failing to instruct sua sponte with CALJIC No. 8.50 that the People were required to prove beyond a reasonable doubt the defendant did not act as a result of *heat of passion*. (*Speight*, at pp. 1233, 1240-1241, 1244.) *Speight* observed the defendant in that case did "not spend much time explaining how the court erred in failing to instruct the jury on that point." (*Id*. at p. 1241.) Nor did the appellate court in *Speight* discuss the fact the trial court in that case gave to the jury (1) CALJIC 2.90, and (2) instructions on attempted murder, malice, attempted voluntary manslaughter, *and heat of passion*.

b. *Application of the Law to This Case.*

(1) *We Assume the Trial Court Erred by Failing to Give CALJIC No. 8.50.*

In the present case, we assume, as a matter of evidence, the issue of imperfect self-defense was properly presented to the jury.[4] However, as mentioned, first, appellant cites no case holding the trial court had a sua sponte duty to instruct, using CALJIC No. 8.50, that the People had to prove beyond a reasonable doubt appellant did not act in imperfect self-defense. Second, *Sandoval*, presenting an analogous situation involving perfect self-defense, militates against any such sua sponte duty to give such a combining instruction.

---

[4] Saucedo said Garcia "banged on" appellant and Garcia had a gun; at least three witnesses (Flores, Anguiano, and Rodriguez) testified they heard three gunshots and/or about three gunshots; Garcia was shot only once; and Saucedo saw an unknown male grab something after Garcia was shot. Moreover, the shooting occurred in an area claimed by the 18th Street gang, Garcia had been an associate of that gang, Notorious and 18th Street gangs were rival gangs, and appellant was a Notorious member, facts from which a jury might have concluded appellant was afraid at the time of the shooting.

12

Third, *Sandoval* concluded a trial court had no sua sponte duty to give a *Sanchez* instruction, i.e., a combining instruction relating reasonable doubt to perfect self-defense, assuming separate instructions were given on those issues. *Adrian* observed that in homicide cases the function performed by a *Sanchez* instruction is now fulfilled by CALJIC No. 5.15. CALJIC No. 5.15 is a combining instruction, relating reasonable doubt to perfect self-defense.

CALJIC No. 5.15 is analogous to CALJIC No. 8.50 to the extent the latter relates the People's burden to imperfect self-defense. By parity of reasoning, we might very well have concluded based on *Sandoval* and *Adrian* that the trial court in the present case had no sua sponte duty to give CALJIC No. 8.50, a combining instruction relating the People's burden to imperfect self-defense, because the court gave separate instructions on (1) the People's burden (CALJIC No. 2.90) and (2) murder (CALJIC No. 8.10), malice (CALJIC No. 8.11), and imperfect self-defense (CALJIC No. 5.17) (all discussed *post*). This is particularly true where, as here, the trial court in the present case also, using CALJIC No. 1.01, told the jury to "[c]onsider the instructions as a whole and each in light of all the others" and we, as an appellate court, must consider the instructions as a whole and assume jurors are intelligent persons capable of understanding and correlating all given instructions. (*Ramos, supra,* 163 Cal.App.4th at p. 1088.)

We note *People v. Mower* (2002) 28 Cal.4th 457, *People v. Simon* (1995) 9 Cal.4th 493, *People v. Shelmire* (2005) 130 Cal.App.4th 1044, and Evidence Code section 502 support the notion a trial court must instruct on the allocation and nature of the burden of proof. However, neither those cases nor that section addresses the issue of whether that requirement must be satisfied by a single, combining instruction (like CALJIC No. 8.50) as opposed to separate instructions with an instruction they are to be read as a whole. Although appellant cites *People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*) for the proposition CALJIC No. 8.50 "implements *Mullaney's* constitutional command," *Najera* involved CALJIC No. 8.50 as it relates to heat of passion, not imperfect self-defense (*Najera,* at p. 227), and, more importantly, we have already explained *Mullaney* does not command that principles of the burden of proof and

13

imperfect self-defense be contained in a single, *combining* instruction. Nonetheless, in light of *Speight*, we assume without deciding the trial court in this case erred by failing to give CALJIC No. 8.50 to instruct that the People had the burden to prove beyond a reasonable doubt the absence of imperfect self-defense.

However, we reject appellant's other argument about CALJIC No. 8.50, i.e., because the trial court did not give CALJIC No. 8.50, the trial court never told the jury that, even if a defendant has intent to kill, imperfect self-defense negates malice, precluding guilt for murder. CALJIC No. 8.10 indicated murder required killing with malice. CALJIC No. 8.11 indicated, inter alia, express malice was based on *intent to kill* and if express malice or implied malice was present, no *other* mental state needed to be *shown* to *establish* malice. CALJIC No. 5.17 indicated a person who killed in imperfect self-defense *lacked* malice and did *not* commit murder. However, imperfect self-defense negates malice, not intent to kill. Moreover, CALJIC No. 8.40 (see fn. 5, *post*) told the jury a defendant could harbor intent to kill even though imperfect self-defense negated malice, CALJIC No. 8.10 (discussed *post*) told the jury that, absent malice, a defendant could not be guilty of murder, and CALJIC No. 1.01 told the jury to consider all instructions as a whole.

Notwithstanding appellant's related argument to the contrary, CALJIC No. 5.17 did not conflict with CALJIC No. 8.11, the latter of which pertained to express and implied malice, and indicated that when an intentional killing was done with express or implied malice, no *other* mental state needed to be shown to establish malice aforethought. Instead, CALJIC No. 5.17 was exceptive, indicating when malice was not established. This is consistent with the fact that " '[g]enerally' " (*Rios, supra,* 23 Cal.4th at p. 460) intent to unlawfully kill constitutes malice (*ibid.*), *except* a defendant who intentionally and unlawfully kills nonetheless lacks malice when the defendant unreasonably believes the defendant must act in self-defense (*id.* at p. 460).

During jury argument, appellant presented an alternative argument that imperfect self-defense negated malice, precluding guilt for murder but permitting guilt for manslaughter, and the jury should convict appellant of voluntary manslaughter. The

14

parties disputed during jury argument whether there was evidence of imperfect self-defense.  Any theoretical possibility of jury confusion that CALJIC Nos. 8.11 and 5.17 conflicted was diminished by the parties' jury arguments.  (*Hajek and Vo, supra*, 58 Cal.4th at p. 1220.)  The jury, during deliberations, asked no questions of the court; the jury thus did not express confusion about any such alleged conflict.  (Cf. *Hajek and Vo,* at p. 1221; *People v. Garceau* (1993) 6 Cal.4th 140, 189 (*Garceau*).)  We conclude the trial court adequately instructed the jury that, even if a defendant has intent to kill, imperfect self-defense negates malice, precluding guilt for murder.

(2)  *Any Instructional Error Was Not Prejudicial.*

Even if the trial court erred by failing to give CALJIC No. 8.50, it does not follow we must reverse the judgment.  *Speight* concluded trial court error in failing to give CALJIC No. 8.50 could be found harmless beyond a reasonable doubt.  (*Speight, supra,* 227 Cal.App.4th at pp. 1245-1246.)  We assume without deciding that that standard of prejudice applies here.  For the following reasons, we conclude the trial court's failure to give CALJIC No. 8.50 was harmless beyond a reasonable doubt.

First, Penal Code section 1096a, states, "In charging a jury, the court may read to the jury Section 1096, *and no further instruction on the subject* of the presumption of innocence or defining reasonable doubt need be given."  (Italics added.)  The substance of section 1096 has been incorporated into CALJIC No. 2.90 (*People v. Aranda* (2012) 55 Cal.4th 342, 352 (*Aranda*)), which was given to the jury.

Second, *Sandoval* taught a trial court has *no sua sponte duty* to give a combining instruction relating the People's burden to perfect self-defense (where adequate separate instructions were given).  *Adrian* indicated CALJIC No. 5.15 is such a combining instruction and, as previously discussed, CALJIC No. 8.50 is analogous.  These facts militate against a conclusion a trial court's failure to give CALJIC 8.50 is *prejudicial* where adequate separate instructions are given.  As discussed below, the trial court in this case gave adequate separate instructions.

15

*Adrian* and *Wittig* considered the separate instructions of CALJIC Nos. 2.90 and 2.01, and perfect self-defense instructions, when evaluating prejudice. In the present case, the trial court gave CALJIC No. 2.90. It stated, in relevant part, "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of *proving him guilty* beyond a reasonable doubt." (Italics added.) The trial court in this case also gave CALJIC No. 2.01 on the sufficiency of circumstantial evidence; we discuss that instruction separately *post*.

The court, using CALJIC No. 2.61, instructed on appellant's right not to testify, an instruction that did not expressly refer to a People's "burden" or obligation but implied a People's burden and related it to *elements* of the charge. The instruction stated, "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential *element* of the charge against him. No lack of testimony on the defendant's part will make up for a failure of proof by the People so as to support a finding against him on any essential *element*. (Italics added.)

The court, using CALJIC No. 8.10, instructed on the *elements* of murder as follows: "[Appellant is] accused . . . of having committed the crime of murder, a violation [of] section 187 of the Penal Code. [¶] Every person who unlawfully kills a human being with malice aforethought, *is guilty* of the crime of murder in violation of Penal Code section 187. [¶] A killing is unlawful, if it is neither justifiable nor [excusable]. [¶] In order to *prove* this crime, each of the following *elements* must be proved: [¶] 1. A human being was killed; [¶] 2. The killing was unlawful; and [¶] 3. The killing was done with *malice*." (Italics added.)

The court gave CALJIC No. 8.11 concerning express and implied malice. That instruction stated, " 'Malice' may be either express or implied. [¶] Malice is express when there is manifested an intention unlawfully to kill a human being." CALJIC No. 8.11 also set forth the components of implied malice (generally, an intentional act

16

resulting in death and performed with conscious disregard for life).  The instruction further stated, "When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought."

The court, using CALJIC No. 5.17, instructed on imperfect self-defense.  The instruction stated, in relevant part, "A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully *but does not harbor malice* aforethought and is *not guilty* of murder."[5]  (Italics added.)  Finally, the court gave CALJIC No. 1.01, which told the jury, inter alia, to "[c]onsider the instructions as a whole and each in light of all the others."

In sum, the above instructions effectively told the jury that to prove appellant *guilty* of murder beyond a reasonable doubt, the People had to prove the *element* of malice beyond a reasonable doubt and, since a person who killed in imperfect self-defense *lacked* malice and was *not guilty* of murder, the People, proving the *element* of malice, had to prove beyond a reasonable doubt appellant *did not* kill in imperfect self-defense.  This is consistent with *Rios's* conclusion that when the element of malice is otherwise established, except evidence of the mitigating circumstance of imperfect self-defense (sufficient to raise a reasonable doubt of the defendant's guilt for murder) has been presented to the trier of fact, the People must prove beyond a reasonable doubt the absence of that mitigating circumstance in order to prove beyond a reasonable doubt the presence of the element of malice.  Because the trial court gave adequate separate instructions on the People's burden and imperfect self-defense, and told the jury to

---

[5]     The court, using CALJIC No. 8.40, instructed on voluntary manslaughter.  The instruction stated, "Every person who unlawfully kills another human being *without malice* aforethought but either with an intent to kill, or with conscious disregard for human life, is guilty of voluntary manslaughter in violation of Penal Code section 192, subdivision (a).  [¶]   There is *no malice* aforethought if the killing occurred in the actual but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury."  (Italics added.)

17

consider instructions as a whole, no prejudice resulted from the trial court's failure to give CALJIC No. 8.50.[6]

Third, the trial court did not give a combining instruction using the term "burden" and relating the People's burden (1) to the murder *element* requiring the killing of a human being, or (2) to the murder *element* requiring that the killing was done with malice. Instead, the court gave (1) CALJIC No. 2.90, on the People's burden, (2) CALJIC No. 8.10, defining murder, including the elements of the killing of a human being and a killing done with malice, and (3) CALJIC No. 1.01, telling the jury to consider instructions as a whole. If the trial court did not err by giving separate instructions on the People's burden and these elements, the court did not prejudicially err by giving separate instructions on the People's burden and the mitigating circumstance of imperfect self-defense.[7]

Fourth, in the present case, the People's evidence contained no direct evidence appellant harbored malice. For example, the People's evidence contained no statement from appellant to police that he harbored malice. Appellant, as was his right, did not testify; therefore, there was no direct testimony he killed in imperfect self-defense. In other words, the evidence appellant killed *with malice*, as well as the evidence he killed *in imperfect self-defense*, was wholly circumstantial.

---

[6]     The trial court in this case gave the jury CALJIC No. 2.90 and instructions on imperfect self-defense. The trial court also (using CALJIC No. 5.15, see fn. 3, *ante*) impliedly instructed on the People's burden and *perfect* self-defense. It is arguable the giving of CALJIC No. 5.15 might have suggested to the jury the People did not have the burden to prove beyond a reasonable doubt appellant did not act in *imperfect* self-defense. However, any such argument is of no consequence given the numerous reasons supporting our conclusion no prejudicial instructional error occurred in this case.

[7]     During oral argument here, appellant asserted the jury was told *the prosecution had to prove the elements beyond a reasonable doubt*, and the jury was told malice was an element. However, the jury was never given a *combining* instruction containing both statements and including the explicit reference to the requirement that the People prove elements beyond a reasonable doubt. Instead, the jury was given separate instructions on these issues, i.e., CALJIC No. 2.90, CALJIC No. 8.10 (defining murder with its elements, including the element that the killing was done with malice), and CALJIC No. 1.01.

18

The court, using CALJIC No. 2.01, instructed on the sufficiency of circumstantial evidence. That instruction indicated if circumstantial evidence permitted two reasonable interpretations, one pointing to guilt and the other to innocence, the jury had to acquit appellant. The evidence of malice pointed to appellant's *guilt for murder* and the evidence of imperfect self-defense pointed to his *innocence for murder* (even though evidence of imperfect self-defense pointed to his guilt for voluntary manslaughter). In sum, CALJIC No. 2.01 was merely another way of restating the proof beyond a reasonable doubt standard, and the jury, by convicting appellant of murder based on circumstantial inferences he harbored *malice*, necessarily rejected circumstantial inferences he killed *in imperfect self-defense*. (Cf. *People v. Reliford* (2003) 29 Cal.4th 1007, 1016.) As mentioned, *Sanchez*, *Adrian,* and *Wittig* concluded no prejudicial instructional error occurred, each case relying in part on the fact CALJIC No. 2.01 was given.

Fifth, the court repeatedly instructed on the principle of the People's burden, the standard of proof beyond a reasonable doubt, and/or reasonable doubt, when instructing the jury on the People's burden (CALJIC No. 2.90), the sufficiency of circumstantial evidence (CALJIC No. 2.01), the fact appellant could rely on the state of the evidence (CALJIC No. 2.61), the burden of proof regarding justification on a charge of murder (CALJIC No. 5.15), doubt as to whether first or second degree murder had occurred (CALJIC No. 8.71), partial verdicts (CALJIC No. 8.75), and the firearm use (CALJIC No. 17.19), firearm discharge (CALJIC No. 17.19.5), and gang (CALJIC No. 17.24.2) enhancements. No other burden or standard of proof was enunciated by any instruction in this case.

Sixth, there is the matter of the evidence of appellant's guilt. Voluntary manslaughter based on imperfect self-defense is a lesser-included offense of murder, and a trial court must instruct on said lesser-included offense when substantial evidence supports such an instruction. (*People v. Duff* (2014) 58 Cal.4th 527, 561-562.) However, substantial evidence is merely evidence substantial enough to merit *consideration* and, in this context, evidence from which a jury reasonably *could* conclude appellant committed

19

only the lesser-included offense (*id.* at p. 561; *Breverman*, *supra,* 19 Cal.4th at p. 162). Evidence may be substantial even though it may not be of a character that inspires belief (cf. *People v. Springfield* (1993) 13 Cal.App.4th 1674, 1680) and, if evidence is substantial, the "*relative* strength of the evidence" (*Breverman*, at p. 160) does not obviate the rule the trial court must instruct sua sponte on lesser-included offenses supported by substantial evidence. (*Ibid.*) Finally, in deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, which is a task for the jury. (*Id.* at p. 162.)

However, we may consider whether substantial evidence of imperfect self-defense was extremely weak when determining the issue of prejudice and whether there was overwhelming evidence of appellant's guilt, thereby rendering harmless beyond a reasonable doubt any erroneous failure to instruct on imperfect self-defense. (Cf. *People v. Sakarias* (2000) 22 Cal.4th 596, 621.) In *Aranda,* our Supreme Court stated, "The reviewing court conducting a harmless error analysis under [*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*)] looks to the 'whole record' to evaluate the error's effect on the jury's verdict. [Citation.] We note in this regard that a *Chapman* harmless error analysis for instructional error typically includes review of the *strength* of the prosecution's case. [Citation.] Indeed, the harmless error inquiry for the erroneous omission of instruction on one or more elements of a crime focuses *primarily* on the *weight* of the evidence adduced at trial." (*Aranda*, *supra,* 55 Cal.4th at p. 367, first and third italics added.)

Even if Saucedo's ultimate statements to Durazo provided substantial evidence of imperfect self-defense, that evidence was extremely weak. It was impeached by Saucedo's initial statements to Durazo. In Saucedo's initial statements, Saucedo made no mention of Garcia, appellant, Garcia and appellant "banging on" each other, either having a gun, or Saucedo seeing a shooting. According to Saucedo's initial statements, he heard shooting, then went outside and saw an unknown male run toward a dead body, grab something, and flee. Saucedo's ultimate statements to Durazo concerning what happened were so dramatically different from Saucedo's initial statements that the jury reasonably

20

would have concluded parts of either the initial statements or the ultimate statements were fabricated. Indeed, Saucedo's initial statement to Durazo that Saucedo was inside his residence, heard gunshots, and went outside was effectively a denial by Saucedo himself that Saucedo saw Garcia with a gun, and the jury reasonably would have concluded that either that denial, or Saucedo's ultimate statement to Durazo that Garcia had a gun, was fabricated.

Saucedo's ultimate statements were also impeached by the facts Saucedo and appellant were both Notorious members and, according to Rodriguez, after the shooting Saucedo asked Rodriguez to let appellant, Saucedo's "homey," hide in Rodriguez's residence.

On the other hand, the testimony of Medina, Flores, Anguiano, and Rodriguez provided evidence the person who shot Garcia left the scene, but none of those witnesses testified Garcia had a gun. Medina testified no weapons were around Garcia. When Schilling arrived at the scene, he saw no weapons near Garcia. Durazo denied any evidence obtained during her investigation supported Saucedo's assertion Garcia had a gun.

Further, there was substantial evidence Fernandez heard appellant tell police he had been inside sleeping when the shooting occurred, but she knew appellant's statement was a lie. Saucedo told Fernandez appellant committed the shooting. Indeed, appellant's above statement to police that he had been sleeping when the shooting occurred was effectively a denial by appellant himself that appellant saw Garcia with a gun. In sum, there was overwhelming evidence appellant committed murder, not voluntary manslaughter based on imperfect self-defense; therefore, no prejudicial error occurred.

Seventh, as mentioned, during jury argument, appellant alternatively urged imperfect self-defense negated malice, precluding guilt for murder but permitting guilt for manslaughter, and the jury should convict appellant of voluntary manslaughter. Eighth, during jury argument, appellant's counsel commented appellant was "entitled to have each of you hold on to the *doubt* that you have." (Italics added.) Appellant's counsel later commented, ". . . I don't have any burden of proof. [The prosecutor] does.

21

[¶] And if you have a reasonable doubt, it's her burden to explain away that doubt so that it goes away. Because while you retain that reasonable doubt, you cannot find my client guilty."

Appellant's counsel later, during jury argument, discussed standards of proof, characterizing them as "possibl[e]," "likely," "probable cause," preponderance of the evidence, clear and convincing evidence, and finally, beyond a reasonable doubt, arguing only the last applied in the present case. Appellant's counsel also indicated that to convict appellant, the jury needed to have an abiding conviction.

Ninth, "[t]he *subjective* elements of [perfect] self-defense and imperfect self-defense are *identical*. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 (*Viramontes*), italics added; *People v. Oropeza* (2007) 151 Cal.App.4th 73, 82 [same].) What distinguishes the two theories is perfect self-defense includes, but imperfect self-defense lacks, the requirement that the belief be reasonable. (*Viramontes,* at p. 1262.)

A defendant who kills in perfect self-defense must have an honest and reasonable belief in the need to defend. (*People v. Trevino* (1988) 200 Cal.App.3d 874, 878 (*Trevino*).) A " 'bare fear is not enough; "the circumstances must be sufficient to excite the fears of a reasonable person, *and the party killing must have acted under the influence of such fears alone*." (Pen. Code, § 198.)' [Citation.]" (*Trevino*, at pp. 878-879, italics added.) "[T]he party killing may justifiably use deadly force in [perfect] self-defense as long as the use of such force is motivated *only* by a reasonable fear and the belief that it is necessary to prevent his death or great bodily injury." (*Id.* at p. 879.)

Since the subjective elements of perfect and imperfect self-defense are identical (*Viramontes*, *supra,* 93 Cal.App.4th at p. 1262) (and lacking any reasonableness requirement), it follows the party killing may use deadly force in *imperfect* self-defense as long as the use of such force is motivated *only* by a fear and belief that it is necessary to prevent the party's death or great bodily injury. In other words, the party killing must have acted under the influence of such fear *alone*. In the present case, the jury found

22

appellant committed the present offense for the benefit of, at the direction of, and in association with, a criminal street gang. That finding is inconsistent with a conclusion appellant killed motivated *only* by a fear and belief that it was necessary to prevent appellant's death or great bodily injury, or that appellant acted under the influence of such fear *alone*. (Cf. *People v. Prettyman* (1996) 14 Cal.4th 248, 276.) Tenth, the defense evidence in this case pertained to the issue of identity, not to issues involving imperfect self-defense. Based on all of the above factors, we conclude any erroneous failure by the trial court to give CALJIC No. 8.50 was harmless beyond a reasonable doubt.[8]

2. *The Jury Instructions Did Not Preclude Jury Consideration of Imperfect Self-Defense.*

Appellant presents the related claim the jury instructions permitted the jury to convict appellant of murder without the jury considering whether he was guilty of voluntary manslaughter based on imperfect self-defense. Appellant focuses on, inter alia, CALJIC Nos. 8.10 (regarding the elements of murder), 8.11 (regarding malice), and 5.17 (regarding imperfect self-defense). We reject his claim.

As mentioned, we consider instructions as a whole (*Ramos, supra,* 163 Cal.App.4th at p. 1088) and assume jurors understood and correlated them. CALJIC Nos. 8.10, 8.11, 8.40 (see fn. 5, *ante*), and 5.17, read together, did not permit the jury to convict appellant of murder absent jury consideration of whether he was guilty of voluntary manslaughter based on imperfect self-defense. Instead, the instructions effectively told the jury it could convict appellant of murder *unless* the jury concluded he killed (1) with intent to kill or with conscious disregard for life *and* (2) in imperfect self-defense (negating malice), in which case he would be guilty of voluntary manslaughter.

---

[8]     The fact the prosecutor made comments which appellant claims were misconduct does not alter our analysis, since we conclude *post* no prosecutorial misconduct occurred.

23

Moreover, appellant argued to the jury, inter alia, imperfect self-defense negated malice, precluding guilt for murder but permitting guilt for manslaughter, and the jury should convict appellant of voluntary manslaughter. The jury, during deliberations, asked no questions of the court. These facts diminish the possibility of jury confusion arising from the challenged instructions. (*Hajek and Vo, supra*, 58 Cal.4th at p. 1220; *Garceau, supra,* 6 Cal.4th at p. 189.) We conclude the trial court fully and fairly instructed the jury on the applicable law, and there was no reasonable likelihood the jury applied the instructions at issue in an impermissible manner. No instructional error occurred.

The fact that, once it was shown a killing resulted from the intentional doing of an act with express or implied malice, no *other* mental state needed to be shown to *establish* malice, did not preclude the jury from considering whether, once it was shown a killing resulted from the intentional doing of an act with intent to kill or conscious disregard for life, malice was *absent* and appellant could be guilty of voluntary manslaughter. We consider the instructions as a whole. If we did not, it would mean the trial court, using CALJIC No. 5.15, instructed on perfect self-defense and, using CALJIC No. 5.17, instructed on imperfect self-defense, without ever permitting the jury to consider the elements of murder or what malice was, since neither CALJIC No. 5.15 nor CALJIC No. 5.17 instructed on those issues. Finally, in light of our previous discussion about CALJIC No. 2.01, circumstantial inferences, the overwhelming evidence of appellant's guilt, jury argument on imperfect self-defense and voluntary manslaughter, and the jury's verdict as it relates to CALJIC No. 2.01 as well as to whether appellant killed motivated only by the belief required by imperfect self-defense, the alleged instructional error was harmless beyond a reasonable doubt.

24

3. *No Prosecutorial Misconduct Occurred.*

During opening argument, the prosecutor commented, ". . . when you hear the argument by counsel, and more importantly, when you go back and deliberate, ask yourself *if there is any proposition that is posed to you by [defense counsel]* that you can think of in the jury room *about what the evidence means or what conclusion you can draw from it*. [¶] The first thing I want you to ask yourself is, is that reasonable? Because although [defense counsel] doesn't have a burden of proof, if he gets up here and *asks you to base your verdict on any proposition*, the first thing you need to ask yourself is, is there evidence for that proposition because your verdict has to be based on the evidence." (Italics added.) Appellant posed an "[i]mproper argument" objection and the court overruled it.

The prosecutor then commented, "You have to *base your verdict* on the *evidence*. And so *if you are asked* to draw *any conclusions* from this, *from the evidence* you are presented, *any theories*, they have to be based in evidence or a reasonable interpretation of the evidence. [¶] So I just ask that you ask yourselves that question, is *this proposition* reasonable? Is it *based on the evidence*? Not one piece of evidence but the entirety of the evidence." (Italics added.) During closing argument, the prosecutor commented, "This idea that there's two guns. Where is the evidence? I began my opening argument to you yesterday by saying *if [defense counsel] wants to propose something* to you -- and yes, he had no burden. But he is *asking you to make certain conclusions*. *Those conclusions* have to be based *in fact*, *in evidence*, and they have to be reasonable." (Italics added.)

Appellant claims the prosecutor's above comments were misconduct. The claim is unavailing. Appellant failed to object on the ground of prosecutorial misconduct and failed to request a jury admonition with respect to the challenged comments, and a jury admonition would have cured any harm. Appellant waived the issue of whether the comments constituted misconduct. (*Cf. People v. Gionis* (1995) 9 Cal.4th 1196, 1215; *People v. Mincey* (1992) 2 Cal.4th 408, 471.)

25

Even if the prosecutorial misconduct issue were not waived, appellant's claim is without merit. Appellant argues the prosecutor committed misconduct because, notwithstanding the prosecutor's comments, "[d]efense argument may be based entirely on the lack of evidence at trial, and the defense may ask jurors to draw inferences from the lack of evidence." Appellant also argues the prosecutor committed misconduct by arguing "that propositions favorable to the defense, . . . must be based in the evidence." However, first, the thrust of the prosecutor's comments pertained, not merely to propositions favorable to the defense, or to whether defense propositions were based on the evidence, but to defense propositions about what the evidence meant, and defense propositions about what conclusions could be drawn from the evidence.

Second, CALJIC No. 2.90, given by the trial court, stated as part of its definition of reasonable doubt that it was the state of the case which, "after the entire comparison and consideration of all the evidence," left jurors such that they could not say they felt an abiding conviction of the truth of the charge.

The language quoted immediately above has been construed as informing the jury the People may not meet their burden of proof based on evidence not offered at trial. (*People v. Garelick* (2008) 161 Cal.App.4th 1107, 1118.) The language cannot reasonably be interpreted as precluding the jury from considering any perceived lack of evidence when determining the defendant's guilt. (*Ibid.*) To the extent the prosecutor commented (1) if the defense asked the jury to base its verdict on any proposition, it had to be based on the evidence, or (2) any defense theories or propositions had to be based in, or on, the evidence, the prosecutor's comments were proper and analogous to the above quoted language in CALJIC No. 2.90 as judicially construed.[9] Finally, the prosecutor herself presented argument based on lack of evidence, and effectively asked

---

[9]    We note the trial court, using CALJIC No. 1.00, told the jury its first duty was to "determine what facts have been proved from the evidence received in the trial and not from any other source." The court, using CALJIC No. 1.03, told the jury it "must decide all questions of fact in this case from the evidence received in this trial and not from any other source."

jurors to draw an inference from the lack of evidence, when the prosecutor commented, "This idea that there's two guns.  Where is the evidence?"

There was no reasonable likelihood the prosecutor's comments were misconstrued or misapplied by the jury, or interpreted in an improper or erroneous manner.  (*People v. Frye* (1998) 18 Cal.4th 894, 970.)  The comments did not render appellant's trial fundamentally unfair in violation of his right to due process, nor did the prosecutor use deceptive or reprehensible methods to attempt to persuade the court or jury.  (See *People v. Hill* (1998) 17 Cal.4th 800, 819).)[10]  No prosecutorial misconduct occurred.[11]  Finally, our analysis in the last sentence in the last paragraph of part 2, *ante*, that no prejudicial error occurred applies with equal force here.  Any prosecutorial misconduct was harmless beyond a reasonable doubt.  (Cf. *Chapman, supra,* 386 U.S. at p. 24.)

4.  *Sufficient Evidence Supported the Gang Enhancement.*

Appellant claims insufficient evidence supports the Penal Code section 186.22, subdivision (b) gang enhancement, because insufficient evidence supports the "primary activities" element of subdivision (f).  We disagree.  Our power begins and ends with the determination whether there is substantial evidence, contradicted or uncontradicted, to support the judgment. (*People v. Hernandez* (1990) 219 Cal.App.3d 1177, 1181-1182.) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. . . .  [¶]  Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony . . . ."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323-324.)

---

[10]    In light of our previous discussion, we reject appellant's claim cumulative prejudicial error occurred.

[11]    *People v. Centeno* (2014) 60 Cal.4th 659, cited by appellant in his supplemental letter, does not compel a contrary conclusion.

We have recited in our Factual Summary the pertinent facts and have considered appellant's arguments. We conclude there was sufficient evidence the primary activities of Notorious included murder, assault with a deadly weapon, and robberies (Pen. Code, § 186.22, subd. (e)(1), (2), & (3)), and sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, Notorious had "as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, . . . of subdivision (e)" within the meaning of Penal Code section 186.22, subdivision (f).[12]

### DISPOSITION

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



KITCHING, J.

We concur:



EDMON, P. J.



ALDRICH, J.

---

[12] None of the cases cited by appellant compel a contrary conclusion. This includes *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611-612, which is distinguishable. (*People v. Margarejo* (2008) 162 Cal.App.4th 102, 107-108; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330.)